**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

EPSILON ENERGY USA, INC.,

      Plaintiff,

v.

CHESAPEAKE APPALACHIA, LLC,

      Defendant.

CIVIL ACTION NO. 1:21-CV-433

## VERIFIED COMPLAINT

Plaintiff Epsilon Energy USA, Inc. ("Epsilon"), by and through its attorneys, files this Verified Complaint against Defendant Chesapeake Appalachia, LLC ("CHK") and alleges as follows:

### PARTIES

1.    Epsilon is an Ohio corporation with its principal place of business in Houston, Texas.

2.    The citizenship of a corporation is determined by its state of incorporation and the location of its principal place of business. *See* 28 U.S.C. § 1332(c)(1).

3.    Thus, Epsilon is a citizen of Texas and Ohio.

4.    CHK is an Oklahoma limited liability company with its principal place of business in Oklahoma City, Oklahoma.

5. CHK's sole member is Chesapeake Energy Corporation, an Oklahoma corporation with a principal place of business in Oklahoma City, Oklahoma.

6. Chesapeake Energy Corporation is an Oklahoma citizen.

7. The citizenship of a limited liability company is determined by the citizenship of its members. *See Lincoln Ben. Life Co. v. AEI Life, LLC*, 800 F.3d 99, 105 (3d Cir. 2015) (citing *Zambelli Fireworks Mfg. Co. v. Wood*, 592 F.3d 412, 420 (3d Cir. 2010); *Johnson v. SmithKline Beecham Corp.*, 724 F.3d 337, 348 (3d Cir. 2013)).

8. CHK is therefore a citizen of Oklahoma.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship between Epsilon and CHK and the amount in controversy exceeds $75,000, excluding interest and costs. 28 U.S.C. § 1332(a).

10. Venue for this matter lies in this District pursuant to 28 U.S.C. § 1391 because (1) a substantial part of the events or omissions giving rise to Epsilon's claims took place in this District and (2) the property that is the subject of this action is located within this District in Susquehanna County, Pennsylvania. 28 U.S.C. § 1391(b)(2).

11. An actual controversy exists between the parties hereto within the meaning of 28 U.S.C. § 2201, *et seq*, with respect to CHK's duties under certain

2

Joint Operating Agreements ("JOAs") that it entered into with Epsilon and other parties.

## FACTUAL BACKGROUND

### A.    The Joint Operating Agreements

12.    Beginning in 2009, Epsilon and CHK, along with other oil and gas companies (each a "JOA Party" and collectively the "JOA Parties"), began entering into JOAs for drilling units covering acreage subject to oil and natural gas leases which had been (or would be) combined for the purposes of natural gas development.

13.    Epsilon and CHK are parties, among other entities, to an Operating Agreement dated October 18, 2010 for the Baltzley North Unit ("Baltzley North JOA"). A true and correct copy is attached hereto as Exhibit 1.

14.    Epsilon and CHK are parties, among other entities, to an Operating Agreement dated October 18, 2010 for the Baltzley South Unit ("Baltzley South JOA"). A true and correct copy is attached hereto as Exhibit 2.

15.    Epsilon and CHK are parties, among other entities, to an Operating Agreement dated December 16, 2010 for the Craige Unit ("Craige JOA"). A true and correct copy is attached hereto as Exhibit 3.

16.    Epsilon and CHK are parties to a Farmout Agreement dated February 1, 2010, which covers the Blanche Poulsen North and Blanche Poulsen South Units ("Poulsen Units") and incorporates a draft model JOA that applies to those units

("Poulsen JOA"). A true and correct copy of the Farmout Agreement is attached hereto as Exhibit 4, the Poulsen JOA appears in Schedule 7.1.2, at 61.

17. As part of the JOAs, Epsilon and CHK agreed to contribute their interests in oil and gas leases and to jointly develop those leases as drilling units within the geographical areas set forth in the JOAs.

18. Each JOA identifies each JOA Party's working interest thereunder.

19. Each of the JOAs at issue herein covers a different pooled unit, which is identified as the "Contract Area." Exhibit 1, Baltzley North JOA, Article I.C.; Exhibit 2, Baltzley South JOA, Article I.C; Exhibit 3, Craige JOA, Article I.C; Exhibit 4, Poulsen JOA, Article I.C.

20. Each JOA is a stand-alone document for each specific asset or Unit.

21. Any JOA Party is entitled to propose the drilling and completion of a well ("Well Proposal"). Exhibit 1, Baltzley North JOA, Article VI.1; Exhibit 2, Baltzley South JOA, Article VI.1; Exhibit 3, Craige JOA, Article VI.1; Exhibit 4, Poulsen JOA, Article VI.1.

22. Upon receipt of the Well Proposal, the other JOA Parties are required to elect whether they will consent to participate with their working interests (and thereby pay a pro rata share of the costs of developing the well). Exhibit 1, Baltzley North JOA, Article VI.1; Exhibit 2, Baltzley South JOA, Article VI.1; Exhibit 3, Craige JOA, Article VI.1; Exhibit 4, Poulsen JOA, Article VI.1.

23.     If any JOA Party wishes to propose operations that conflict with the Well Proposal, it has 30 days to propose those conflicting operations. Exhibit 1, Baltzley North JOA, Article VI.6; Exhibit 2, Baltzley South JOA, Article VI.6; Exhibit 3, Craige JOA, Article VI.6; Exhibit 4, Poulsen JOA, Article VI.6.

24.     Under each JOA, the JOA Parties designated CHK to serve as the default operator for wells drilled thereunder. Exhibit 1, Baltzley North JOA, Article V.A.; Exhibit 2, Baltzley South JOA, Article V.A; Exhibit 3, Craige JOA, Article V.A; Exhibit 4, Poulsen JOA, Article V.A.

25.     If CHK elects not to participate in a Well Proposal and declines to serve as the operator, one of the consenting JOA Parties may serve as the operator for that well. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

26.     If less than all JOA Parties elect to participate, the proposing party is required to notify the other consenting JOA Parties of the working interests consenting and whether the proposing party recommends proceeding with the Well Proposal. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

27.     The consenting JOA Parties may participate with their proportionate share of working interest that are not yet participating. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

28.     If the proposing party does not withdraw the Well Proposal, the proposing party is deemed to be participating with any outstanding interests needed to equal 100 percent participation. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

29.     Once 100 percent participation is reached, the JOA Party serving as the operator will commence operations in accordance with the Well Proposal. Exhibit 1, Baltzley North JOA, Article VI.2(a); Exhibit 2, Baltzley South JOA, Article VI.2(a); Exhibit 3, Craige JOA, Article VI.2(a); Exhibit 4, Poulsen JOA, Article VI.2(a).

30.     Article XVI of the JOAs sets forth the requirements for a proposal to drill a horizontal well.

31.     In order to fulfill those requirements, a party proposing a horizontal well must include: "(1) the estimated commencement date, (2) the proposed depth, (3) the objective formation or formations to be penetrated or tested; (4) the Authorized Objective, the surface and bottomhole locations, proposed directional

operations; and (5) the estimated costs of the operation, including, but not limited to, the estimated costs of drilling, testing, and Completing or abandoning the well. Operator's estimate of Completion costs should be included as an informational item." Exhibit 1, Baltzley North JOA, Article XVI.A.2(a); Exhibit 2, Baltzley South JOA, Article XVI.A.2(a); Exhibit 3, Craige JOA, Article XVI.A.2(a); Exhibit 4, Poulsen JOA, Article XVI.A.2(a).

32.     The JOAs contain a section entitled Order of Preference of Operations setting forth the protocol if JOA Parties submit conflicting proposals and cannot agree upon the manner in which to proceed with a proposed operation. Exhibit 1, Baltzley North JOA, Article XVI.A.2(b); Exhibit 2, Baltzley South JOA, Article XVI.A.2(b); Exhibit 3, Craige JOA, Article XVI.A.2(b); Exhibit 4, Poulsen JOA, Article XVI.A.2(b).

33.     Article XVI states "In the event of a conflict of inconsistency between the provisions of this Article XVI and any other provisions of this Agreement, *the provisions of this Article XVI shall control and prevail*." Exhibit 1, Baltzley North JOA, Article XVI.E (emphasis added); Exhibit 2, Baltzley South JOA, Article XVI.E; Exhibit 3, Craige JOA, Article XVI.E; Exhibit 4, Poulsen JOA, Article XVI.E.

## B.  The Settlement Agreement

34.  In September 2018, Epsilon filed a complaint against CHK in this Court styled as *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, L.L.C.*, No. 3:18-cv-01852.

35.  Among the allegations in that lawsuit, Epsilon asserted that CHK failed to follow the election processes in the JOAs at issue (which included the Baltzley South and Baltzley North JOAs) in order to thwart Epsilon's efforts to propose and drill new wells.

36.  Epsilon sought declaratory and injunctive relief, among other demands for relief, and filed a motion for preliminary injunction.

37.  Before an injunction hearing occurred, the parties settled the dispute. A true and correct copy of the Settlement Agreement and Release entered on October 8, 2018 ("Settlement Agreement") is attached here as Exhibit 5.

38.  In the Settlement Agreement, CHK explicitly agreed:



Exhibit 5, at ¶¶ 8, 8(d).

39.    Accordingly, ███████████████████████████████
███████████████████

40.    CHK further agreed that, ████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
████████████████████████████████████

## C.    Ownership of Subsurface and Surface Rights

41.    Upon information and belief, CHK has obtained surface and subsurface easements for the estates that are subject to the Baltzley North, Baltzley South, Craige, Poulsen North, and Poulsen South Units.

42.    Under the JOAs, if any party owns or acquires an oil and gas interest in the estates subject to the Baltzley North, Baltzley South, Craige, Poulsen North, and Poulsen South Units, the interest is treated as if it were covered by the Oil and Gas Lease attached as an exhibit to the JOAs. Exhibit 1, Baltzley North JOA, Article III; Exhibit 2, Baltzley South JOA, Article III; Exhibit 3, Craige JOA, Article III; Exhibit 4, Poulsen JOA, Article III.

43.    Oil and gas interest is a defined term that "shall mean unleased fee and mineral interest in Oil and Gas in tracts of land lying with the Contract Area which are owned by parties to this Agreement." Exhibit 1, Baltzley North JOA, Exhibit B;

Exhibit 2, Baltzley South JOA, Exhibit B; Exhibit 3, Craige JOA, Exhibit B; Exhibit 4, Poulsen JOA, Exhibit B.

44.     The exemplar lease attached to the JOAs provides broad rights to the subsurface and surface rights "as may be necessary or convenient . . . to explore for, develop produce, measure, and market production from the Leasehold, and from adjoining lands . . . to drill, maintain, operate . . . wells; to use or install roads, electric power . . . and to construct pipelines with appurtenant facilities . . . to use oil, gas and non-domestic water sources, free of cost . . ; to operate, maintain, repair and remove material and equipment." Exhibit 1, Baltzley North JOA, Exhibit B; Exhibit 2, Baltzley South JOA, Exhibit B; Exhibit 3, Craige JOA, Exhibit B; Exhibit 4, Poulsen JOA, Exhibit B.

45.     Moreover, the JOAs require that CHK permit a Non-Operator (such as Epsilon) or its duly authorized representative "full and free access at all reasonable times to all operations of every kind and character being conducted for the joint account on the Contract Area." Exhibit 1, Baltzley North JOA, Article V.D.5; Exhibit 2, Baltzley South JOA, Article V.D.5; Exhibit 3, Craige JOA, Article V.D.5; Exhibit 4, Poulsen JOA, Article V.D.5.

46.     Accordingly, if any JOA Party obtains an easement or other right to use property within a JOA's Contract Area, the other JOA Parties have the same right to use that property.

10

47.     Finally, the JOAs expressly state that, while all parties "shall be free to act on an arm's-length basis in accordance with their own respective self-interest, [that freedom is] subject, however, to the obligation of the parties to act in good faith in their dealings with each other with respect to activities hereunder." Exhibit 1, Baltzley North JOA, Article VII.A; Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII.A.

**D.      Ownership of Water Rights**

48.     In February 2016, CHK and Aubmarc Properties, LLC ("Aubmarc") — a wholly owned subsidiary of Epsilon — entered a Purchase and Sale Agreement ("PSA"). An accurate and correct copy of relevant parts of the PSA is attached as Exhibit 6.

49.     Under the PSA, Aubmarc agreed to purchase certain properties (the "Properties") from CHK. *Id.* at Art. 2, p. 21.

50.     Properties specifically included ████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████." *Id.* at Art. 1, p. 14.

51.     Aubmarc purchased the Properties subject to any ████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ ." *Id.* at Art. 1, p. 13.

52.     ████████████████████████████████████████████████

████████████████████████████ *Id.* at Exhibit A.

53.     The Wyalusing Creek surface water withdrawal is the water source for the Craige well pad. *See* Exhibit 7, SRBC Commitment Letter.

54.     The JOAs require that "any [ ] facility necessary for the operation and development of the Contract Area shall be included as an integral part of any proposed operation made under Article VI.B of this Agreement . . . . Facility includes, but is not limited to . . . water handling and disposal facilities located within the Contract Area and specifically applicable to the proposed operation." Exhibit 1, Baltzley North JOA, Article XVI.B (Gathering Lines/Facilities); Exhibit 2, Baltzley South JOA, Article XVI.B; Exhibit 3, Craige JOA, Article XVI.B; Exhibit 4, Poulsen JOA, Article XVI.B.

55.     The parties to the JOAs are required to pay their pro rata share of the expenses associated with the building, repair, and use of the water facilities in the Contract Area and CHK is subject to accounting audits to ensure that parties are

accurately billed for such expenses. *See* Exhibit 1, Baltzley North JOA, Article VII.A (Liability of Parties); Exhibit 2, Baltzley South JOA, Article VII.A; Exhibit 3, Craige JOA, Article VII.A; Exhibit 4, Poulsen JOA, Article VII. A ("Each party . . . shall be liable only for its proportionate share of the costs of developing and operating the Contract Area.").

56.     Accordingly, the JOA Parties — including Epsilon — have paid their pro rata share of the costs associated with the use and maintenance of the Water Facilities.

**E.     The Proposed Wells**

57.     In May 2020, Epsilon began discussions with CHK regarding new well proposals that would advance Epsilon's goals of growth and production in the Auburn Development.  Exhibit 8, May 12, 2020, H. Clanton to J. Woodard.

58.     In conjunction with these discussions, Epsilon shared its ideas for proposed wells at the Craige Pad, located in Rush Township, Susquehanna County, Pennsylvania.  Exhibit 8, May 26, 2020, H. Clanton to J. Woodard.

59.     Throughout June 2020, the parties continued to discuss the design and spacing of the wells that Epsilon desired to drill.  Exhibit 8, May-June 2020 E-mail Discussions, H. Clanton and J. Woodard.

60.     After an exchange between the parties regarding permitting, CHK requested further information on how Epsilon proposed to operate the wells. Exhibit 8, September 28, 2020, J. Woodard to H. Clanton.

61.     Epsilon responded that it was "less interested in who operates the proposed program as long as we believe quality, safety and costs are controlled. We are prioritized on developing the Marcellus reserves in Auburn and the larger resource for the benefit of our shareholders." Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

62.     Epsilon continued:

As we understand the JOA, CHK has the following options when well proposals are made by others. CHK can; consent and operate, non-consent but operate at the consenting parties request, or decline to operate. In a scenario where CHK elects not to participate and declines to operate, the consenting party or parties have the right to operate. We need to understand how CHK would transfer operatorship and cooperate with the designated operator, no matter whom.

An alternative approach could be to have one of the consenting parties serve as contract operator (drill/complete/flowback/turn-over to CHK @ TIL) with CHK remaining the operator of record.

Again, thank you for your attention to the resolution of this matter. We understand development in Auburn may not be a priority to CHK both from a manpower resources and commercial perspective, however it is obviously important to EPSN.

Exhibit 8, September 28, 2020, H. Clanton to J. Woodard.

63.     After this exchange, the parties discussed various options for how to move forward with Epsilon's suggested wells. However, it became apparent to

14

Epsilon that CHK was not interested in proceeding with the development of those wells. Exhibit 8, September 29, 2020-October 14, 2020, H. Clanton to J. Woodard.

64.    On October 14, 2020, Epsilon advised CHK that Epsilon intended to move forward with the wells that Epsilon had suggested to ensure it could meet permitting timelines for those wells. Exhibit 8, October 14, 2020, H. Clanton to J. Woodard.

65.    The next day, Epsilon reminded CHK that Article VI.2 of the JOAs enabled Epsilon to proceed with the wells even if CHK elected not to participate and declined to serve as the operator of those wells. Exhibit 8, October 15, 2020 H. Clanton to J. Woodard.

66.    In a separate communication, Epsilon provided CHK with further reason to move forward with Epsilon's suggested wells, noting that the JOA Parties would benefit from a 10% discount on the gathering rate. Exhibit 9, Oct. 16, 2020, M. Raleigh to J. Taylor.

67.    Two months later, on December 16, 2020, Epsilon reiterated its plan to drill new wells on the Craige Pad. Exhibit 9, Dec. 16, 2020, M. Raleigh to J. Taylor.

68.    CHK responded that there was "not much incentive to CHK to work a deal here" and indicated that CHK wanted to come up with a scenario where "Epsilon agrees not to propose on CHK . . ." Exhibit 9, Dec. 16, 2020 J. Taylor to M. Raleigh.

69.     Epsilon responded that it would be willing to consider other options but that it intended to continue pursuing its opportunities as allowed under the JOAs. Exhibit 9, Dec. 17, 2020 M. Raleigh to J. Taylor.

70.     In response, CHK asserted — for the very first time — that it effectively possessed veto power under the JOAs to "prevent the development of wells that CHK did not want to drill. CHK [was] not trying to prevent Epsilon from any rights that it may have under the JOA. We simply feel that there is no obligation on the part of CHK to drill these wells." Exhibit 9, Dec. 18, 2020, J. Taylor to M. Raleigh.

71.     With discussions at a standstill, Epsilon formally proposed four wells on December 23, 2020 in accordance with the procedure set forth in the JOAs: Craige N 1LH, Craige N 1UHC, Craige N 4UHC ("Craige North Wells") and Craige S 3LHC ("Craige South Well") to be located in Rush Township, Susquehanna County, Pennsylvania (the "Proposed Wells").

72.     In conjunction with the Proposed Wells, CHK could elect between three options:  (1) elect to participate in the drilling and completion of the Proposed Wells and to serve as the operator; (2) elect not to participate in the Proposed Wells but to serve as the operator; or (3) elect not to participate in the Proposed Wells and decline to serve as the operator (such that Epsilon would serve as the operator).

73.     The other JOA Parties for the Craige South Well included Equinor Onshore Properties, Inc. (f/k/a Statoil) ("Statoil"), Chief Oil & Gas LLC (formally,

MKR Holdings, LLC) ("Chief"), Jamestown Resources, L.L.C. ("Jamestown"), Enerplus Resources (USA) Corporation ("Enerplus"), Radler 2000 Limited Partnership ("Radler"), Tug Hill Marcellus, LLC ("Tug Hill"), and Unconventionals Natural Gas, LLC ("Unconventionals").

74.    The other JOA Parties for the Craige North wells included Statoil and Jamestown.

75.    Chief, Radler, and Tug Hill elected to participate in the Craige South Well.  However, Statoil, Jamestown, Enerplus, and Unconventionals elected not to participate.

76.    The other JOA Parties elected not to participate in the Craige North Wells.

## F.    CHK's Refusal to Cooperate and Allow Epsilon Access to Jointly-Owned Property

77.    On January 19, 2021, CHK advised that it would not participate in the drilling of the Proposed Wells and would not act as operator.  CHK also asserted that Epsilon is not permitted to serve as the operator, and on that basis, refused to grant Epsilon access to the Craige well pad in order to drill the Proposed Wells. Exhibit 10, Jan. 19, 2021 Non-Consent Letter, C. Moad to R. Collins.

78.    In a letter dated that same day (although it was not delivered to Epsilon until January 21, 2021), CHK proposed a new well known as the Koromlan 107HC ("Koromlan Well") that would be located in Rush Township, Susquehanna County,

Pennsylvania. Exhibit 11, Jan. 19, 2021 Koromlan Well Letter, C. Moad to R. Collins.

79.     CHK suggested that the Proposed Wells were in conflict "with the *planned* drilling of Chesapeake's Koromlan 107HC." Exhibit 11, Jan. 19, 2021 Koromlan Well Letter, C. Moad to R. Collins (emphasis added).

80.     On January 20, 2021, CHK further stated: "Chesapeake maintains the right to Operate the Craige pad site and associated wells, and hereby does not grant approval or authority to Epsilon, or anyone else, to Operate from referenced pad. . . . Subsequently, Chesapeake has plans to drill the Koromlan 107HC in early 2022, which is in conflict with Epsilon's proposed Craige S 3LHC. As such, Chesapeake's well proposal will be forthcoming along with all elections for Epsilon's proposed wells." Exhibit 12, January 20, 2021, Scott Glenn to Mike Raleigh.

81.     On February 9, 2021, Epsilon provided CHK with the required notice that it had received 100% Subscription to proceed with the Proposed Wells. Exhibit 13, February 9, 2021 Epsilon's Notice of 100% Subscription.

82.     On February 11, 2021, Epsilon requested an update on the status of the letter that Epsilon needed CHK to sign so that Epsilon could obtain the water permit that it needed to drill the Proposed Wells (as discussed in the next section). Exhibit 14, February 11, 2021, R. Collins to C. Moade.

83.    Ten minutes later, CHK responded by (1) reiterating its assertion that

the JOAs do not allow Epsilon, or any other JOA Party, to drill a new well if CHK

elects not to participate in that well and (2) stating that CHK would not sign the letter

that Epsilon needed to obtain a water permit for the Proposed Wells.  Exhibit 14,

Feb. 11, 2021, J. Woodard to R. Collins.

84.    Epsilon responded:

It is hard for Epsilon to understand why Chesapeake takes the position
of stopping production by claiming a super veto power that is counter
to the JOAs or our prior Settlement Agreement.  It is not in good faith
and in fact it is deemed to be in bad faith.  Of course, Article VI2 allows
for another Operator when the designated Operator will not agree to
operate.  Again, your interpretation is not in good faith.

Epsilon is interested in promoting the production of the joined
resources, which is one of the base reasons for entering a JOA.  Epsilon
is furthering this interest by proposing wells that will be beneficial for
the parties and has also been clear that it is willing to work with
Chesapeake to ensure that Chesapeake can also proceed with its
proposed well.  Epsilon has continued to act in good faith and seeks
only to have Chesapeake recognize its rights under the JOA and the
Settlement Agreement and stop Chesapeake's obstruction of
developing the resources.  The first step in doing so is signing the
SRBC letter, which Chesapeake has done in the past for other
parties.  The next step is confirming that Chesapeake will provide
Epsilon with access to the properties, and otherwise cooperate with
Epsilon, so that Epsilon can fulfill its responsibilities with respect to the
four currently-proposed wells for which it has been designated as the
operator.

85.    Two minutes later, CHK curtly responded: "Respectfully, this is not a

good faith/bad faith discussion.  The plain language of the JOA does not allow for

Epsilon to assume operatorship." Exhibit 14, February 11, 2021, J. Tarantelli to R. Collins.

86.     Epsilon's request for assistance in obtaining a water permit for the Proposed Wells was not a surprise to CHK. Back on July 1, 2020 — when Epsilon shared its development plans with CHK — Epsilon sought CHK's assistance in obtaining the requisite approval from the Pennsylvania Department of Environmental Protection ("PaDEP") and the Susquehanna River Basin Commission ("SRBC") for a water management plan. Exhibit 8, July 1, 2020 H. Clanton to J. Woodard (noting that "Operators are required to submit a Water Management Plan for approval.").

87.     In accordance with its rights under the JOAs, Epsilon intends to use the jointly-owned water impoundment at the Craige Pad to drill certain of the Proposed Wells.

88.     On September 18, 2020, Epsilon sent CHK a draft SRBC commitment letter, which CHK was required to execute in order for Epsilon to be able to use the water impoundment for the Craige Pad. Exhibit 8, September 18, 2020, H. Clanton to J. Woodard.

89.     On September 25, 2020, Epsilon reiterated that it needed CHK to sign the SRBC commitment letter in order for Epsilon "to move forward with [Epsilon's]

well permitting. It's a simple one page, self-explanatory form." Exhibit 8, September 25, 2020 H. Clanton to J. Woodard.

90.     On September 28, 2020, Epsilon contacted CHK once again about the SRBC commitment letter, and this time referenced the parties' obligations under the Settlement Agreement (which expressly required CHK to provide access to jointly-owned assets and water sources). Exhibit 8, Sept. 28, 2020 H. Clanton to J. Woodard.

91.     On September 29, 2020, CHK stated that, until Epsilon was named as the operator of any formally-proposed wells, CHK would not sign the SRBC commitment letter. Exhibit 8, September 29, 2020, J. Woodard to H. Clanton.

92.     After making its formal proposal in December 2020, Epsilon renewed its efforts to obtain the water permit necessary to drill the Proposed Wells. On January 29, 2021, the SRBC provided Epsilon with a commitment letter that CHK had recently used to obtain a similar permit. Exhibit 15, Jan. 29, 2021 G. Miller to W. Jenko.

93.     Using the commitment letter that CHK had recently used, Epsilon prepared a draft commitment letter (to be signed by CHK) that would enable Epsilon to utilize water from the Wyalusing Creek withdrawal point — an asset that Epsilon's subsidiary owns and contributed to the joint operations governed by the JOAs — to drill the Proposed Wells. After reviewing the draft letter, the SRBC confirmed that

it was acceptable and would enable Epsilon to obtain the water permit that it required for the Proposed Wells. Exhibit 15, Jan. 29, 2021 G. Miller to W. Jenko.

94.     On February 9, 2021, Epsilon sent the proposed letter to CHK for execution so that Epsilon could finalize the permitting for its Proposed Wells. Exhibit 13, Feb. 9, 2021 R. Collins to J. Woodard.

95.     On February 11, 2021, CHK advised that it would not sign the SRBC commitment letter. CHK reiterated its position that, because CHK had not elected to participate, Epsilon could not proceed with its Proposed Wells. Exhibit 14, Feb. 11, 2021, J. Woodard to R. Collins.

96.     Furthermore, CHK made clear in its communications with Epsilon that it would not grant Epsilon access to the Craige well pad in order to drill certain of the Proposed Wells. Exhibit 10, Jan. 19, 2021 Non-Consent Letter, C. Moad to R. Collins.

G.     **The Proposal for the Koromlan Well**

97.     The proposal for the Koromlan Well, which CHK dated January 19, 2021 but did not provide to Epsilon until January 21, 2021, indicates that the well would traverse the Craige, Poulsen North, Poulsen South, and Davis Units.

98.     The Koromlan Well would also traverse a drilling unit not yet formed, which CHK described as the Bradbury Unit.

99.    Because the Bradbury Unit has not yet been formed, the Koromlan Well would traverse acreage (including acreage owned by Epsilon) that cannot be pooled because it has not been unitized.

100.    In addition, the Koromlan Well's path is too close to the Craige South Well's path.  Multiple JOA Parties have consented to and approved the Craige South Well, which Epsilon proposed prior to the Koromlan Well proposal.

101.    Further, upon information and belief, the Koromlan Well would traverse a block of acreage known as the Rushboro Ventures block that is not leased (or whose lease is currently in question).

102.    The following is a projection of the path of the Koromlan Well and depicts these issues:



Proposed wells ~400' apart

Bradbury Unit not yet formed?

| | EPSN HBP |
| CHK Rushboro Ventures Leases |
| EPSN Proposed Craige S 3LHC |
| CHK Proposed Koromlan 107HC *(estimated-no landing point given by CHK)* |

103. On February 9, 2021, Epsilon informed CHK that the proposal for the Koromlan Well did not meet the JOA requirements for submitting a proposal. While

Epsilon noted that the Koromlan Well's path would traverse non-unitized acreage, as well as acreage with a title defect, Epsilon indicated that it might support a similar well if these issues could be overcome (provided that CHK proposed such a well in accordance with and compliance with the JOAs). Exhibit 16, Feb. 9, 2021, Koromlan 107HC Well Proposal Response.

## COUNT I – DECLARATORY JUDGMENT
### (Epsilon's Right to Drill the Proposed Wells)

104. The allegations set forth in Paragraphs 1 through 103 are incorporated by reference as if fully set forth herein.

105. Under the terms of the JOAs, CHK was required to make an election with regard to both (1) its participation in the Proposed Wells and (2) its service as the operator for the Proposed Wells.

106. CHK elected not to participate and not to operate the Proposed Wells. However, CHK has refused to cooperate with Epsilon so that Epsilon can drill and operate the Proposed Wells (despite 100% participation being reached).

107. To the contrary, CHK has taken the position that Epsilon may not drill on the Craige well pad because CHK controls the subsurface and surface estates and will not grant Epsilon access to the well pad.

108. CHK has also taken the position that it will not sign the SRBC commitment letter so that Epsilon can obtain the permit that it requires in order to use jointly-owned water facilities to drill the Proposed Wells.

109. CHK's refusal to cooperate so that Epsilon can proceed with the development of the Proposed Wells constitutes a breach of both the Settlement Agreement and the JOAs.

110. Nothing in the Settlement Agreement and/or the JOAs entitles CHK to unilaterally veto a Well Proposal that Epsilon has submitted in accordance with the JOAs.

111. An actual, present and justiciable controversy has arisen between Epsilon and CHK concerning: (1) the Settlement Agreement between the parties; (2) Epsilon's right to drill a new well if CHK elects not to participate and declines to serve as the operator; (3) CHK's refusal to provide access to the well pad so that Epsilon may serve as the operator; and/or (4) CHK's refusal to sign the SRBC commitment letter so that Epsilon may complete its permitting requirements to obtain water necessary to drill the Proposed Wells.

WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that, if CHK elects not to participate in a proposed new well and declines to serve as the operator, then (1) Epsilon has the right to drill and operate the proposed new well; (2) CHK had an obligation to allow Epsilon to access the jointly-owned assets under the JOAs in order to do so, including taking any actions required to facilitate such access; and (3) CHK must otherwise cooperate with the operator designated by the other JOA Parties to facilitate those drilling operations.

26

## COUNT II – BREACH OF CONTRACT
## (SETTLEMENT AGREEMENT)

112.   The allegations set forth in Paragraphs 1 through 111 are incorporated by reference as if fully set forth herein.

113.   The Settlement Agreement is a binding contract between CHK and Epsilon.

114.   CHK confirmed in the Settlement Agreement that ███████████████

███████████████████████████

115.   CHK expressly agreed in the Settlement Agreement that, if ████████

███████████████████████████

███████████████████████████

███████████████████████████

███████████████████

116.   CHK has refused to cooperate with Epsilon with respect to the Proposed Wells.  In particular, CHK has (1) refused to sign the SRBC commitment letter so that Epsilon can obtain the requisite water permitting and (2) denied Epsilon access to the Craige well pad that will be utilized to drill the Proposed Wells.

117.   CHK's refusal to cooperate regarding the Proposed Wells — based on its baseless assertion that only CHK is permitted to operate jointly-owned pad sites and wells within the Baltzley North and South, Craige, and Poulsen North and South Units — constitutes a material breach of the Settlement Agreement.

27

118. Epsilon has suffered harm and damage as a result of CHK's material breach of the Settlement Agreement.

WHEREFORE, Epsilon respectfully requests the Court enter a judgment in its favor, award Epsilon actual damages representing the harm Epsilon has suffered as a result of CHK's refusal to allow Epsilon to commence operations to drill the Proposed Wells, together with interest, costs and fees, and grant Epsilon such other and further relief as it deems just and appropriate.

### COUNT III – BREACH OF CONTRACT
### (SETTLEMENT AGREEMENT)
### (Breach of Implied Covenant of Good Faith & Fair Dealing)

119. The allegations set forth in Paragraphs 1 through 118 are incorporated by reference as if fully set forth herein.

120. The Settlement Agreement is a binding contract between CHK and Epsilon.

121. CHK confirmed under the Settlement Agreement that ███████

██████████████████████████████████████████

122. Under the Settlement Agreement, if █████████████

███████████████████████████████████

███████████████████████████████████

█████████████████████

123. An implied covenant of good faith and fair dealing exists in every contract.

124. CHK was required to take those actions reasonably necessary to carry out the purpose of the Settlement Agreement and to refrain from taking action that would destroy or injure Epsilon's right to receive the benefits of the Settlement Agreement.

125. CHK's refusal to allow Epsilon access to a jointly-owned well pad and to sign the SRBC commitment letter, which have prevented Epsilon from proceeding with the Proposed Wells, constitutes a breach of the duty of good faith and fair dealing associated with the Settlement Agreement.

WHEREFORE, Epsilon respectfully requests the Court enter a judgment in its favor, award Epsilon actual damages representing the harm Epsilon has suffered as a result of CHK's refusal to allow the commencement of operations to drill the Proposed Wells, together with interest, costs and fees, and grant Epsilon such other and further relief as it deems just and appropriate.

## COUNT IV– BREACH OF CONTRACT
### (JOAs)

126. The allegations set forth in Paragraphs 1 through 125 are incorporated by reference as if fully set forth herein.

127. The Baltzley North, Baltzley South, Craige, and Poulsen JOAs are binding contracts between CHK, Epsilon, and the other JOA Parties.

128. CHK has adopted the position that it may unilaterally prevent the drilling of a well proposed by another JOA Party when CHK refuses to participate and declines to serve as the operator.

129. CHK does not possess any such "veto power" under the JOAs.

130. CHK has prevented Epsilon from obtaining full and free access to the Contract Area for the drilling of the Proposed Wells by preventing access to the Craige well pad and refusing to sign the SRBC commitment letter (thereby preventing Epsilon from obtaining the water permit that it requires).

131. CHK does not have the authority to block access to the jointly-owned assets of the parties under the JOAs.

132. Further, the JOAs expressly incorporate a duty on the parties to act in good faith "in their dealings with each other with respect to activities" taken pursuant to the JOAs.

133. By opposing Epsilon's efforts to develop its property rights and meet the shared goal of production, CHK has acted in bad faith.

134. CHK's refusal to allow Epsilon access to a jointly-owned well pad and to sign the SRBC commitment letter, which have prevented Epsilon from proceeding with the Proposed Wells, constitutes a material breach of the JOAs.

135. Epsilon has suffered harm and damage as a result of CHK's material breach of the JOAs.

WHEREFORE, Epsilon respectfully requests the Court enter a judgment in its favor, award Epsilon actual damages representing the harm Epsilon has suffered as a result of CHK's refusal to allow the commencement of operations on the Proposed Wells, together with interest, costs and fees, including attorney's fees, and grant Epsilon such other and further relief as it deems just and appropriate.

## COUNT V – SPECIFIC PERFORMANCE

136. The allegations set forth in Paragraphs 1 through 135 are incorporated by reference as if fully set forth herein.

137. Epsilon has no adequate remedy at law to enforce the JOAs and the Settlement Agreement other than specific performance.

138. Monetary damages would be inadequate to compensate Epsilon for CHK's violations of the Settlement Agreement and the JOAs because property rights are inherently unique and no two tracts of land are identical.

139. Monetary damages would not allow Epsilon to carry out the same, unique exploration activities or prospects anywhere else.

140. CHK's breaches of the Settlement Agreement and the JOAs have damaged the value of Epsilon's mineral interests in an amount that is speculative and difficult to determine.

141. Epsilon needs to timely complete its proposed drilling activity while working conditions are adequate and support doing so, an extensive delay would change the factors Epsilon considered in forwarding the Well Proposals.

142. The only adequate remedy for the violation of Epsilon's rights is to compel CHK to specifically perform the terms and provisions of the Settlement Agreement and the JOAs, including the provisions regarding the election to participate and operate Well Proposals. *See* Exhibit 1, Baltzley North JOA, Articles VI.1, V. 2(a); Exhibit 2, Baltzley South JOA, Articles VI.1., V. 2(a); Exhibit 3, Craige JOA, Articles VI.1, V. 2(a); Exhibit 4, Poulsen JOA, Articles VI.1, VI. 2(a).

WHEREFORE, Epsilon respectfully requests that this Court order CHK to specifically perform under the Settlement Agreement and the JOAs by requiring CHK to (1) allow Epsilon to access the well pad and any other co-owned assets of the JOAs in order to drill the Proposed Wells; (2) sign the SRBC commitment letter so that Epsilon may secure the required permits and use co-owned water sources to drill and operate the Proposed Wells; (3) otherwise reasonably cooperate with Epsilon so that it can drill and operate the Proposed Wells; (4) award Epsilon costs and fees, including attorney's fees; and (5) grant Epsilon such other and further relief as it deems just and appropriate.

## COUNT VI – DECLARATORY JUDGMENT
## (The Koromlan Well)

143.   The allegations set forth in Paragraphs 1 through 142 are incorporated by reference as if fully set forth herein.

144.   Under the terms of the JOAs, CHK is required to permit full and free access to the JOA Parties to all operations of every kind that are conducted for the joint account of the Contract Area.

145.   Further, all JOA parties are required to act in good faith in their dealings with each other.

146.   CHK has suggested that the Koromlan Well should take priority over Epsilon's wells even though the Proposed Wells were previously proposed and received the required 100% Subscription to proceed.

147.   CHK's response to Epsilon's proposal to drill the Proposed Wells failed to comply with the terms of the JOAs.

148.   An actual, present and justiciable controversy has arisen between Epsilon and CHK concerning whether the proposal for the Koromlan Well satisfied the requirements of the JOAs (and thereby constituted a "competing proposal").

WHEREFORE, Epsilon asks the Court to enter a judgment in its favor declaring that the proposal for the Koromlan Well did not satisfy the JOAs requirements and does not prevent Epsilon from drilling the Proposed Wells.

## COUNT VII – INJUNCTIVE RELIEF

149.    The allegations set forth in Paragraphs 1 through 148 are incorporated by reference as if fully set forth herein.

150.    Epsilon seeks injunctive relief to protect its property rights under the JOAs, which are in danger of being irreparably harmed.

151.    There is a substantial likelihood that Epsilon will prevail on the merits of its claims.  Despite the clear terms of the JOAs and the Settlement Agreement, CHK has refused to follow the proper procedure for responding to Well Proposals and/or submitting a competing proposal.

152.    CHK's violations of Pennsylvania law will continue to cause immediate and irreparable harm to Epsilon.

153.    Unless enjoined by the Court, CHK will significantly dilute Epsilon's mineral interests by refusing to take affirmative steps to drill the Proposed Wells.

154.    CHK's actions, if not abated, will irreparably harm Epsilon's property rights, deteriorating its mineral rights underlying the Baltzley, Craige, and Poulsen Units.

155.    Epsilon is required to commence operations on the Proposed Wells within a particular time period, in accordance with the Wells Proposals, and will be unable to do so if CHK is allowed to continue its obstructionist behavior regarding the JOA Parties' jointly-owned assets.

156. Epsilon needs to timely complete its proposed drilling activity while working conditions are adequate and support doing so, an extensive delay would change the factors Epsilon considered in forwarding the Well Proposals.

157. There is no adequate remedy at law available. An award of money damages cannot compensate Epsilon for the harm caused to the value of its mineral interests and exploration activities, which are inherently unique.

158. The irreversible harm to Epsilon's mineral interests are significantly greater than any monetary harm caused by delay to CHK's unlawful activities if injunctive relief is granted. Such overwhelming loss to Epsilon clearly tips the balance of hardship in favor of an injunction.

159. An injunction would serve the public interest because a public interest exists in the enforcement of contracts and protection of legitimate business interests. An injunction is beneficial to the public to have proper and efficient development of oil and gas resources to ensure there is no adverse effect on the supply of natural gas or an adverse impact on natural gas prices.

WHEREFORE, Epsilon respectfully requests that this Court issue a permanent injunction:

    a.    restraining CHK and anyone acting or participating by, through, or in concert with CHK, from:

            i.    interfering with Epsilon's preparation, operation, or drilling of the Proposed Wells, including interference with

Epsilon's access to the well pad and access to water facilities;

ii.      soliciting, encouraging, or causing any other entity or person to interfere with Epsilon's preparation, operation, and drilling of the Proposed Wells, including interference with Epsilon's access to the well pad; or

iii.     soliciting, encouraging, or causing any other entity or person to move forward with the development of the Koromlan Well as currently proposed.

b.    ordering CHK to sign the SRBC commitment letter;

c.    ordering CHK to take all actions necessary to cooperate with Epsilon when CHK does not consent to an Epsilon proposal and declines to serve as the operator for that proposal, including (but not limited to) assistance with permitting and providing access to and use of co-owned assets.

**JURY DEMAND**

160.   Epsilon hereby demands a trial by jury as provided by Rule 38(a) of the Federal Rules of Civil Procedure as to all issues or claims for which a jury trial is allowed.

Dated: March __, 2021

Respectfully submitted,

/s/ *Gregory J. Krock*
Gregory J. Krock
Pa. I.D. No. 78308
Elizabeth M. Thomas
Pa. I.D. No. 322002

MCGUIREWOODS LLP
Tower Two-Sixty
260 Forbes Avenue, Suite 1800
Pittsburgh, PA 15222-3142
(412) 667-6000 (Telephone)
(412) 667-6050 (Facsimile)
gkrock@mcguirewoods.com
ethomas@mcguirewoods.com

Jonathan T. Blank
*Pro Hac Vice Request Forthcoming*
MCGUIREWOODS LLP
652 Peter Jefferson Parkway
Suite 350
Charlottesville, VA 22911
(434) 977-2500 (Telephone)
(434) 980-2222 (Facsimile)
jblank@mcguirewoods.com

*Counsel for Plaintiff Epsilon Energy USA, Inc.*

## VERIFICATION

I, Michael Raleigh, am the Chief Executive Officer of Epsilon Energy USA, Inc. and am authorized to execute this Verification on its behalf. I have read the foregoing **Verified Complaint** and verify that the factual statements therein are true and correct to the best of my knowledge, understanding, and belief. I understand this Verification is made subject to the penalties relating to unsworn falsification to authorities, 28 U.S.C. § 1746.

_____
Michael Raleigh

Dated: March 9, 2021.